PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MIGUEL ESPARZA,

        Plaintiff,

        v.

V.F. CORPORATION, a Pennsylvania corporation, d/b/a US.KIPLING.COM,

        Defendant.

**'26 CV 1752 BJC AHG**

## CLASS ACTION COMPLAINT

Plaintiff Miguel Esparza ("Plaintiff") alleges as follows:

## I.    NATURE OF ACTION

1.    This class action complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law.  When consumers visit the commercial website of https://www.us.kipling.com/ (the "Website"), which is owned and operated by Defendant VF Corp. ("Defendant"), Defendant offers no pop-up cookie consent banner known as a consent management platform ("CMP") on the homepage to disclose to users that the Website uses cookies.  Yet Defendant deploys cookies to a user's browser immediately upon landing on the homepage without offering consumers the ability to opt in or out of tracking, nor any idea how their data is being used once the Defendant gathers it.

2.     Like many internet websites, Defendant designed the Website to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data.   Unlike many other websites, however, Defendant's Website does not offer consumers a choice to browse without being tracked, followed, and targeted by third-party data brokers and advertisers, including TikTok, Facebook, The Trade Desk, Adobe, Xandr, Microsoft, Pinterest, Equativ, Criteo, Index Exchange, Amazon,   ID5, Nativo, Azerion/Improve Digital, Sovrn, Bidswitch, LiveRamp, TapAd, Pubmatic, MediaWallah, TripleLift, Lotame, Live Intent, Magnite, Outbrain, Zeta Global, Nexxen, Media.net., Bloomreach, Google Ads, and Server-side Google Tag Manager. Defendant's lack of a CMP lulls users into a false sense of security that their browsing actions are not being tracked.  In reality, Defendant surreptitiously enables the many third parties—which includes data brokers—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

3.     The Defendant's Website offers, in its footer, under "Your Privacy Choices" hyperlink, an opt-out option, but even if a user opens this window and turns off all non-essential cookie tracking options, the third-party cookies— Bloomreach, Google Ads, and Server-side Google Tag Manager—that began firing from the moment a user lands on the website continue to track and identify users across other sites that also use the service.

4.     Contrary to users' express rejection of non-essential cookies and tracking technologies on the Website, Defendant, nonetheless, caused cookies, including the Third Parties' cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data.  Plaintiff is informed and believes and thereon alleges that these third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications including their browsing history, visit history, website interactions, user

- 2 -

input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain including creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors who toggled off the "Targeting Cookies" button on the Website's "Your Privacy Choices" hyperlink rejected. Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website. Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes, and tort duties.

## II. THE PARTIES

7. Plaintiff is, and was at all relevant times, an individual and resident of San Diego County, California.

8. Defendant is a corporation incorporated under the laws of the State of Pennsylvania with its primary place of business located in Denver, Colorado.

## III. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it has original federal question jurisdiction.

10. Defendant is subject to jurisdiction under California's "long-arm" statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

- 3 -

CLASS ACTION COMPLAINT

11.     Defendant is an online retailer that owns and/or operates the Website, which markets, advertises, and sells handbags, luggage, and related merchandise nationwide and in California.  Defendant has substantial contacts with and receives substantial benefits and income from and through the state of California.  Defendant made, and continues to make, offers to consumers in California.

12.     Defendant engaged in intentional acts by operating its Website and making it available to California residents, advertising its products including luggage and bags via its Website to California residents including Plaintiff, expressly aiming its conduct toward California residents by conducting substantial business with residents of the State of California via its Website, and causing both intangible injuries and economic harm to California residents that Defendant knew would be likely to be suffered in California.

13.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.

14.     The Website is hosted by a server that sends and receives communications in the form of HTTP requests such as "GET" or "POST" requests to and from Internet users' browsers.  For example, when a user clicks on a hyperlink on a Website, the user's browser sends a "GET" request to the Website's server.  The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested).  When the Website server receives an HTTP request, it processes that request and sends back an HTTP response.  The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

15.     An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for

- 4 -

communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

16.    Defendant voluntarily integrated "third-party resources" from the Third Parties into the Website's programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

17.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies.  Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device.  As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users.  Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

18.    First-party cookies are those that are placed on the user's browser directly by the web server with which the user is knowingly communicating (in this case, the Website's servers). First-party cookies are used to track users when they repeatedly visit the same website.

19.    A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; irxcm.com; clarity.ms; etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the

- 5 -

user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

20.    As described further below, the Website has embedded the software code of multiple data brokers registered with the California Privacy Protection Agency. According to the esteemed Brennan Center for Justice, data brokers are "the main purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms….Advertising companies… predatory loan companies, stalkers, and scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."). *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited March 2026).  Plaintiff is informed and believes and thereon alleges that the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

• **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

• **Visit History**: Information about the frequency and total number of visits to the Website;

• **Website Interactions**: Data on which links, buttons, or ads on the Website that a user clicks;

• **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- 6 -

CLASS ACTION COMPLAINT

• **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website's content;

• **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

• **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

• **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

• **Referring URL**: Information about the Website that referred the user to the Website;

• **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;

• **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and

• **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

21.    Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to

CLASS ACTION COMPLAINT

boost website performance and revenue through the collection, utilization, and dissemination of user data.

22. Defendant owns and operates the Website, which allows visitors to receive information about its products, as well as purchase such products. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

23. Defendant chose to install or integrate the Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, it has complete control over whether first-party and third-party cookies are placed on its users' devices and/or transmitted to third parties.

CLASS ACTION COMPLAINT

**B.      Plaintiff's Investigation Has Detected Numerous Pixels, Cookies, and Spyware Operating through the Website Over Time.**

24.     Plaintiff's investigation of the Website has detected numerous cookies, pixels, and spyware operating through the Website over time.  For example, a screenshot of a partial list of the third-party cookies stored on a user's browser is depicted in the screenshot below taken in spring 2026:



25.     Plaintiff's evidence dating back to 2025 is from a http archive file (HAR) of the network activity at the time of Plaintiff's investigation.  Images of cookies are cropped from the images below.

**1.      ID5 Technology**

26.     ID5 Technology ("ID5") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited March 17, 2026).

27.     ID5 is a cross-site identification service used by advertisers and data brokers to track visitors across multiple unrelated websites. When deployed, ID5 generates a unique identifier for each browser and uses this ID to link browsing activity, synchronize user profiles with partner platforms, and enable targeted advertising. ID5's purpose is to

- 9 -

replace third-party cookies with a persistent user ID, allowing participating ad networks to recognize and follow the same user across different sites, even when cookies are restricted.

28.    The Website sends a request to ID5 servers (id5-sync.com) to track the page the visitor has viewed (landing page), the visitor's IP address, and stores a tracking cookie on the user's browser to monitor activity over the next 365 days.  The below screenshot was captured in spring 2026:



29.    The user's IP address is included in the URL parameters depicted in the above screenshot.

**2.    Nativo**

30.    Nativo, Inc. ("Nativo") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited March 17, 2026).

- 10 -

31.     Requests are sent to Nativo servers (postrelease.com) to track visitor activity.

32.     A Nativo tracking cookie is stored on the consumer's Internet browser as depicted in the screenshot below:



### 3.     Sovrn

33.     Sovrn, Inc. ("Sovrn") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 4, 2025). Sovrn's tracking cookies were detected in spring 2026.

34.     Sovrn is an online advertising technology and publisher services platform that helps content creators and publishers monetize their content and connect with advertisers. It provides tools for both ad monetization, like its Ad Exchange, and affiliate marketing, allowing creators to earn commissions by turning product links in their

- 11 -

content into revenue streams. Sovrn uses intent-driven data to help match brands with interested buyers and offers publishers analytics to understand their audience and revenue.

35.     Requests are sent to Sovrn's servers (lijit.com) to synchronize user cookie data stored on third-party platforms.



36.     Tracking cookies are stored on the consumer's Internet browser as depicted in the screenshot image below for 365 days:

| ljt_reader | MOipALZH3-tNFkTFTNi9ulao | .lijit.com | / | 365 days | 1 |

### 4.     Bidswitch

37.     Bidswitch GmBH ("Bidswitch") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited March 17, 2026).  Bidswitch's tracking cookies were detected as of spring 2026.

- 12 -

CLASS ACTION COMPLAINT

38.    BidSwitch functions as a data-brokering intermediary within the digital advertising ecosystem. It connects companies that buy advertising (DSPs) with companies that sell advertising space on websites and apps (SSPs), allowing user identifiers and bidding data to be shared across multiple advertising partners through a single integration. This allows advertising companies to track and target the same individuals across many different websites.



### 5.    LiveRamp

39.    LiveRamp, Inc. ("LiveRamp") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited March 17, 2026).  LiveRamp's tracking cookies were detected as of spring 2026.

40.    A request is sent to the URL "pippio.com" to synchronize user data between LiveRamp and third-party partner platforms. Tracking cookies stored in the browser are included in this request to enhance visitor identification and enable deeper data enrichment, as depicted in the screenshot image below:



### 6.    **Tapad**

41.    Tapad, Inc. ("Tapad") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited March 17, 2026). Tapad's tracking cookies were detected as of spring 2026.

42.    Tapad is an identity resolution service for building audiences for targeted marketing and advertising campaigns. Web beacons are sent to Tapad servers to track visitor activity on the website and synchronize visitor cookies with third-party data platforms. Tracking cookies are stored on the browser and sent with the request allowing visitors to be tracked and identified across other websites using the Tapad service:

CLASS ACTION COMPLAINT



43. The Tapad_DID and Tapad_TS cookies serve as unique identifiers that enable Tapad's cross-device identity resolution technology, connecting user actions across multiple devices to create unified user profiles for advertising purposes:

| Name | Value | Domain | P |
|------|-------|--------|---|
| TapAd_DID | 1431672d-347a-48a9-bd30-3b6d05d8ac97 | .tapad.com | / |
| TapAd_TS | 1771882168318 | .tapad.com | / |

### 7. Pubmatic

44. Pubmatic, Inc. ("Pubmatic") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited March 18, 2026). Pubmatic's tracking cookies were detected in spring 2026.

- 15 -

45.    Pubmatic geolocates users and is an advertising platform for the buying and selling of user data for interest-based advertising campaigns.  The Pubmatic privacy policy states that online identifiers, demographic information, browser and device information, behavioral information, and geolocation information are collected to run targeted advertising.

46.    Requests are sent to Pubmatic servers to synchronize user data with third-party platforms by piggybacking tracking cookies:



47.    Tracking cookies are stored on the browser:

| Name | Value | Domain | P. |
| --- | --- | --- | --- |
| KADUSERCOOKIE | C4D6BE26-93CD-46D8-981F-B59565FDEAB3 | .pubmatic.com | / |
| SPugT | 1771882168 | .pubmatic.com | / |

### 8.    MediaWallah, LLC

48.    MediaWallah, LLC ("MediaWallah") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited March 18, 2026).  MediaWallah's tracking cookies were detected as of spring 2026.

49.    MediaWallah is a company that focuses on data connectivity and identity resolution in the data ecosystem sector.



50.    Cookies are stored on the browser.

| Name | Value | Domain | P. |
|------|-------|--------|----|
| mCookie | bbec9e20-10fe-11f1-af84-2771f0f15a89 | .mediawallahscript.com | / |
| mRemnantVisitedCookie_d41d8cd9... | %7B%22Z4Nllr%22%3A1%7D | .mediawallahscript.com | / |
| mUserCookie | %7B%7D | .mediawallahscript.com | / |

**9.    Lotame**

51.    Lotame Solutions, Inc. ("Lotame") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited March 18, 2026). Lotame's tracking cookies were detected as of spring 2026.

52.    Lotame is a software platform for collecting and managing data. It allows businesses to identify audience segments, which can be used to target specific users and contexts in online advertising campaigns.

- 17 -

CLASS ACTION COMPLAINT

53.     Requests are sent to Lotame servers (crwdcntrl.com) to track visitor activity, and tracking cookies are stored on the web browser for 270 days.



### 10.    **LiveIntent**

54.     LiveIntent, Inc. ("LiveIntent") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry (last visited March 18, 2026).  LiveIntent's tracking cookies were detected as of spring 2026.

55.     LiveIntent is an email marketing automation tool that identifies website visitors and uses behavioral tracking to create marketing audiences for their customers' targeted email marketing campaigns.

56.     A web beacon is sent to LiveIntent (liadm.com) containing persistent user identifiers and third-party tracking IDs used to associate the website visit with an existing cross-site advertising profile, enabling identity linkage, audience enrichment, and targeted advertising across platforms.

57.    The third-party "lidid" cookies are stored for 730 days and contain a persistent user ID to track and identify users:

| Name | Value | Domain | Path | Expires ... | Si. |
|------|-------|--------|------|-------------|-----|
| _li_ss | CggKBgiiARD_HA | i.liadm.com | /s | 30 days | 11 |
| lidid | 03023aab-1b87-4a57-a0da-e7a88197f... | liadm.com | / | 730 days | 14 |

**11.    Magnite**

58.     Magnite, Inc. ("Magnite") had tracking cookies on Defendant's website as of spring 2026.

59.    Magnite is a programmatic advertising platform that operates as a supply-side platform (SSP). It facilitates the automated buying and selling of digital advertising inventory across websites, mobile apps, connected TV (CTV), and streaming services.

60.    Requests to Magnite transmit device-level and browser-level information, including IP address, page URL, referrer, device type, operating system, browser characteristics, and advertising identifiers or cookie-based IDs. These identifiers allow Magnite and its demand-side advertising partners to recognize returning browsers, associate activity across sessions, and participate in cross-site behavioral advertising.

CLASS ACTION COMPLAINT

61.    A web beacon is sent to Magnite servers to track visitors and synchronize cookie data with external platforms. Tracking cookies are stored on the browser, allowing users to be identified and online activity tracked for the next 365 days.



62.    Tracking cookies are stored on the visitor's browser:

| Name | Value | Domain | Path | Expires ... | Size |
|---|---|---|---|---|---|
| audit | 1|6c3pw+v0o/EKY+a0lx+pnZHKQ5vIWKAnu98ZvLl... | .rubico... | / | 365 days | 3: |
| audit_p | 1|6c3pw+v0o/EKY+a0lx+pnZHKQ5vIWKAnu98ZvLl... | .rubico... | / | 365 days | 34 |
| khaos | MLZOW76F-P-HIYU | .rubico... | / | 365 days | 1: |
| khaos_p | MLZOW76F-P-HIYU | .rubico... | / | 365 days | 1! |
| receive-cookie-deprecation | 1 | .rubico... | / | 90 days | 1( |

### 12.    **Outbrain**

63.    Outbrain, Inc. ("Outbrain") is a data broker registered with the California Privacy Protection Agency.  *See* https://oag.ca.gov/data-broker/registration/186707  (last visited March 18, 2026).  Outbrain's tracking cookies were detected as of spring 2026.

64.    Outbrain is an advertising platform that uses AI to deliver targeted content ads to users based on their interests and browsing behavior.

65. Tracking requests are sent to Outbrain servers to track visitor activity on the website.



### 13. **Zeta Global**

66. Zeta Global is a data broker registered with the California Privacy Protection Agency. *See* https://oag.ca.gov/data-broker/registration/192108 (last visited March 18, 2026). Zeta Global's tracking cookies were detected as of spring 2026.

67. Zeta Global is a customer data platform that aggregates user data across third-party "partner" platforms to create a unified customer data record. After using the data to create a single customer profile, Zeta Global then "activates" the data, which is a process of analyzing and categorizing users by their identifiable attributes. Businesses monetize these "segmented" audiences targeted advertising and marketing campaigns.

68. Requests are sent to Zeta Global servers (rezync.com, boomtrain.com) to track visitor activity.



69.     Tracking cookies are stored on the visitor's browser:

| Name | Value | Domain | P.. |
|---|---|---|---|
| sd-session-id | .eJwNikEOgyAQAP-yZ2lYVtmFzxiUbUJaaSN6qfHv... | live.rezyn... | / |
| zync-uuid | 48d23776-edfa-4cfa-9012-a38eb3b15936:17718... | rezync.com | / |

### 14.   **Nexxen**

70.     Nexxen, Inc. ("Nexxen") is a data broker registered with the California Privacy Protection Agency. *See* https://oag.ca.gov/data-broker/registration/573332 (last visited March 18, 2026). Nexxen tracking cookies were detected as of spring 2026.

71.     The Nexxen platform enables businesses to identify and segment visitors for marketing campaigns by collecting and analyzing audience data. This data can be bought or sold between companies to use for targeted advertising, deanonymizing users, or further monetization by reselling user data.

72.     Third-party tracking cookies (1rx.io; turn.com) are stored, and visitor browsing habits and interests are gathered, allowing companies to create highly detailed

user profiles. The tracking cookies allow for user devices to be identified for enhanced tracking and the delivery of targeted content.



### 15.   Media.net

73.    Media.net is a global ad network that connects advertisers with publishers to deliver relevant ads to website visitors. It uses contextual targeting technology to match ads with content on a publisher's website. Media.net's tracking cookies were detected as of spring 2026.



### 16.    **Azerion/Improve Digital**

74.    Improve Digital is the Supply Side Platform (SSP) arm of Azerion Services B.V., which automates the buying and selling of digital ads (URL: 360yield.com):



CLASS ACTION COMPLAINT

**17.    TripleLift**

75.    TripleLift's tracking cookies were detected as of spring 2026.

76.    TripleLift is a programmatic advertising platform that tracks users to run targeted ads and marketing campaigns, as well as geolocates users.



| Name | Value | Domain | Path | Expires ... | Size |
|---|---|---|---|---|---|
| tluid | 2700209739518889194367 | .3lift.com | / | 90 days | |
| tluidp | 2700209739518889194367 | .3lift.com | / | 90 days | |

**18.    TikTok**

77.    TikTok's tracking cookies were detected as of spring 2026.

78.    The website monitors visitor activity and sends requests to the TikTok platform, enabling TikTok to identify visitors and track behavior with hyper-granular details.

79.    The TikTok pixel collects visitor IPv6 address. Web beacons are sent to TikTok servers to track visitor activity and enrich data using visitors IPv6 address. Additional data tracked includes the page URL viewed, device type, device IPv4 address,

CLASS ACTION COMPLAINT

device user agent, event timestamp, page view unique ID, session unique ID, message event unique ID, and user tracking IDs.

80.    The TikTok _ttp tracking cookie is used to collect data about users for the purposes of delivering targeted interest-based ads. Below is a screenshot of the first-party and third-party cookie stored on the browser:

| Name | Value | Domain | P |
|------|-------|--------|---|
| _ttp | 3A5UwsCdZj4u4pQRZQLJddOprdZ | .tiktok.com | / |
| _ttp | 01KJ66GEJ4499C3EJ8G61P4PNA_.tt.0 | .kipling.com | / |

### 19.    Facebook

81.    The Facebook pixel collects detailed information about each pageview, including the page URL/referrer, device user-agent, screen dimensions, language settings, timing metrics, _fbp first-party cookie, and the event ID. This data is sent alongside technical metadata (user agent, platform, integration source) and is used to

CLASS ACTION COMPLAINT

identify the visitor, track their activity across the site, and associate the visitor with a Facebook account when possible. Meta also automatically receives the visitor's IP address and logged-in Facebook identifiers/cookies server-side, enabling geolocation, identity matching, and cross-site behavioral profiling. Facebook's pixel was detected as of spring 2026.



82.    Cookies are sent with the request. The c_user cookie stores the Facebook user ID which can directly identify logged in user accounts. The datr cookie is used to identify a unique browser/device and can be used by Facebook to internally identify logged out users. The fr cookie is used for ad tracking and contains an encrypted version of the Facebook user ID which can directly identify users.

| Name | Value | Domain | Path |
|------|-------|--------|------|
| ar_debug | 1 | .facebook.com | / |
| c_user | [redacted] | .facebook.com | / |
| datr | TDyOab1FsPH789D7OF7wmMd_ | .facebook.com | / |
| fr | 1YUUIxYVI5YRovzCX.AWfSbfymuFDQiaz... | .facebook.com | / |

83. The Meta _fbp cookie is a Facebook identifier that is set by Facebook's source code which is stored as first-party cookie data and able to track users over the next 90 days.

| Name | Value | Domain |
|------|-------|--------|
| _fbp | fb.1.1771882167119.1630101758 | .kipling.com |

#### 20. **The Trade Desk**

84. The Trade Desk, Inc. ("The Trade Desk") is an American multinational technology company that specializes in real-time programmatic marketing automation technologies, products, and services, designed to personalize digital content delivery to users.

85. The website sends a request to The Trade Desk that identifies users and tracks their behavior across the website. This data is used to build audiences for target advertising and marketing campaigns.



| Name | Value | Domain | Path |
|------|-------|--------|------|
| TDCPM | CAEYBSABKAlyCwjw_rG9q8v... | .adsrvr.org | / |
| TDID | 68cb40af-0de8-41b3-9d56-... | .adsrvr.org | / |

### 21. __Adobe Audience Manager__

86.    The Audience Manager feature offered by Adobe gathers user data from websites to develop behavioral profiles and categorize users into targeted audiences. This information is utilized for purposes such as targeted advertising and customizing website content to enhance user experience. Additionally, visitor IP addresses are collected at the start of each new session to identify geolocation, enabling segmentation of users for more relevant advertising efforts.

87.    The website uses third-party cookies for Demdex.net to assign tracking IDs to users and record their online activity via data sent in network requests. These are the

CLASS ACTION COMPLAINT

tracking cookies stored on the browser for enhanced visitor identification and tracking with future requests.



88.     The "demdex" tracking cookie is used to identify a specific user to link their activities on this website to a visitor profile already stored. The Data Provider Match, or "dpm" cookie, is used when a website is trying to identify visitors and add their activity to an existing matched user.

### 22.   Xandr

89.     Xandr is a Microsoft-owned data aggregation company that operates an online platform for buying and selling consumer data for digital advertising campaigns

90.     When a visitor accesses a website using Xandr, a request is sent to the Xandr tracking URL (adnxs.com), which allows Xandr to gather data about the user's device and location. The X-Proxy-Origin in the response header reveals the device's IP address, which identifies the geographic region from where the request originated. The User IP address in the X-Proxy-Origin response header and tracking cookies are stored on the browser:

CLASS ACTION COMPLAINT



91. The The X-Proxy-Origin is an HTTP header used to expose privacy-sensitive information by design. When a user connects directly to a server, the client's IP address is sent to the server, but if a user connection passes through any forward or reverse proxies, the server only sees the final proxy's IP address. By passing the original client's IP address in the X-Proxy-Origin header, the backend servers are able to identity and preserve the user's IP address.

### 23.   Microsoft/Bing

92. If a user is logged into any Microsoft account, Microsoft can link the visit to their real identity including name, email address, and any other information linked to the account. Logged-out users are still tracked under a persistent MUID cookie (machine unique identifier) that follows users across sites. Microsoft later merges the pseudonymous profile with a user's account once they sign in again.

93. A request is sent to the Microsoft service Bing.com to behaviorally track visitors, reporting content they have viewed across their session on the website. After the request is processed by Bing, the server assigns visitors a machine unique identification

value that allows for enhanced visitor identification and tracking across multiple website sessions.



94.    The MUID cookie is used for marketing/advertising and identifies a unique web browser and track visits across websites. The tracking cookie is stored on the visitor's computer for a year:

| Name | Value | Domain | Path |
|------|-------|--------|------|
| MR | 0 | .bat.bing.com | / |
| MUID | 3541A39E413E65980355B49740546491 | .bing.com | / |

### 24.    **Pinterest**

95.    Pinterest is a social media network that monetizes visitor data through displaying targeted advertisements.

CLASS ACTION COMPLAINT

96.    The website sends requests track visitor activity on the website. Visitors that are not currently logged in on the platform are assigned a "pin_unauth" identification value to track site activity. The payload contains device details that are used to enhance fingerprinting individual users.



97.    Tracking cookies are stored on the browser and sent with the request:

| Name | Value | Domain | Path | E |
|------|-------|--------|------|---|
| _pinterest_ct_... | TWc9PSZJRTdqdjd4Wk03SmNqdlp5aF... | .ct.pinterest.com | / | 2 |
| ar_debug | 1 | .pinterest.com | / | 2 |

### 25.    Equativ

98.    Equativ, formerly known as Smart AdServer and Sharethrough, is a global advertising technology company that provides a unified platform for both advertisers and publishers.  This includes programmatic video, connected TV (CTV), and retail media.

- 33 -

The company provides tools such as an ad server, a Supply-Side Platform (SSP), and a Demand-Side Platform (DSP).



### 26. <u>Criteo</u>

99. Criteo is a digital advertising platform that collects and aggregates user data so advertisers can target users to deliver interest-based advertisements to their devices. The website sends requests to Criteo to record information about visitors, such as the unique URL viewed, device identifiers, and external tracking IDs, which are used for data synchronization with the Criteo platform.



100.    Third-party tracking cookies are stored on the browser, allowing Criteo to record visitor browsing activity across multiple sites.

### 27.    Index Exchange

101.    Index Exchange is an SSP that allows websites to monetize website visitors by allowing advertisers to bid to display ads to users. Requests sent to Index Exchange servers (casalemedia.com) contain tracking cookies stored on the browser:

CLASS ACTION COMPLAINT



### 28.    **Amazon Product Ads**

102.    Amazon Product Ads use significant amounts of consumer data to target users both on and off Amazon's website and app. The Amazon Advertising Tag placed on third-party sites such as Defendant's track behavior across the web.



| Name | Value | Domain | Path |
|---|---|---|---|
| ad-id | A74N0V3obUAesh46NiMf4Gg | .amazon-adsystem.... | / |
| ad-privacy | 0 | .amazon-adsystem.... | / |

**29.    Google Tag Manager (Server-side)**

103.    Requests are sent to Google servers to track the activity of visitors on the site. This data is then shared with third-party services on the backed-end (server). The requests to Google contain a list of first-party cookies that contain user tracking IDs for third-party platforms, allowing new data to be added to existing user records.

104.    Below is a screenshot of the data payload:



105.   The below screenshot shows the first-party cookies sent with the requests:



CLASS ACTION COMPLAINT

**30.     Google Advertising**

106.    Network requests are sent to Google Advertising endpoints (pagead2.googlesyndication.com). The data collected enables Google to profile users for retargeting eligibility, link browsing sessions across devices, and measure ad campaign performance.

107.    Data transmitted via these requests includes the device IP address, browser and device metadata (User-Agent string), page URL, event metadata, Google click IDs, and timestamped behavioral interaction data.



**31.     Bloomreach**

108.    Bloomreach is a website personalization service that uses AI to selectively display content based on visitor behavioral profiles built from tracked data. The URL p.brsrvr.com is used as an API endpoint to track visitors, including server-side IP address harvesting. The request below contains data used to fingerprint visitor devices and track data on their interests and online activities.

- 39 -

109. After rejecting the use of targeting cookies, the Bloomreach pixel (brsrvr.com/pix.gif) tracks visitor activity on the website. The data payload contains user cookie IDs, page URL, page title, product category, referrer page, and event timestamps.



110. The Bloomreach user ID sent in the request is stored on the browser as a first-party cookie, allowing visitors to be identified across sessions.

| Name | Value | Domain | P... | Expires / Max-Age |
|------|-------|--------|------|-------------------|
| _br_uid_2 | uid%3D1524461875810%3Av%3D17.1%3Ats%3D17... | .kipling.com | / | 2027-03-30T21:00:59.022Z |

## C. Defendant Falsely Informed Users that They Can Opt Out of the Website's Use of Cookies.

111. When consumers visit the Website, the Website immediately begins tracking them without informing them or allowing them to opt out via a consent banner.

112. Website users who are privy to how data can be transferred may click the "Your Privacy Choices" link in the footer, which displays to users this message:

CLASS ACTION COMPLAINT



# kipling

×

## YOUR PRIVACY CHOICES

We use cookies and similar tracking technologies, and allow our advertising partners to use such technologies, so we can, among other things, show you ads promoting Kipling on third-party sites and services. These activities may be considered "sales," "sharing," or "targeted advertising" under certain privacy laws. To opt out, slide the toggle below so that it states "OFF" and then click the "Confirm My Choices" button. Note that you will need to renew this opt-out choice if you visit this website from another device or browser or if you clear your cookies. If you live in a state that gives you the right to opt out via a legally recognized opt-out preference signal, such as the Global Privacy Control, we will also treat visits to our website with such a signal enabled as an opt-out request.

In addition to ad targeting activities that rely on cookies, we work with advertising partners to translate other identifiers, such as your email address or phone number, into a unique identifier (called a hashed value) that such partners can then use to show ads that promote our products to you across the web and in mobile apps. To opt out, please visit www.vfc.com/dsr-requests/kipling, select "Request to Opt-Out of Selling or Sharing Personal Information," and provide the requested information. For more information about our privacy practices, please see our Privacy Policy.

**Targeting Cookies**                                On ⬤

CONFIRM MY CHOICES

Powered by onetrust

113.   However, even if the "Targeting Cookies" option is toggled off, the third-party cookies that were loaded before consent are not removed from browser storage.

114.   This means that the spyware platforms are still able to track—and identify—users across other sites that also use the service.

CLASS ACTION COMPLAINT

115. Defendant's "Your Privacy Choices" option led Plaintiff, and all those similarly situated users of the Website, to believe that they declined or rejected all cookies and tracking technologies, especially those that share personal information with third parties, such as performance, targeting, and social media cookies. The link further reasonably led Plaintiff and other Website users to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon toggling off the "Targeting Cookies" button.  Defendant's representations, however, were false.

116. In truth, Defendant did not abide by its users' wishes.  Even though Defendant received notice that certain users, through their rejection of "Targeting Cookies," did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website, Defendant nonetheless caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data—***even for those users who elected to reject all non-essential cookies***.

117. In particular, even after Plaintiff rejected "Targeting Cookies," Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiff tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

- 42 -

CLASS ACTION COMPLAINT

118.  Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions.

119.  The following screenshot, obtained using one such tool, shows an example of Third-Party cookies being transmitted from a Website user's device and browser to the servers of one particular third party, Google Tag Manager, even after the Plaintiff rejected "Targeting Cookies":



120.  Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies.

CLASS ACTION COMPLAINT

121. As users interact with the Website, even after rejecting the "Targeting Cookies," thereby declining the use of cookies and similar technologies that share personal information with third parties, such as performance, targeting, and social media cookies, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, enable the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies enable Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

122. The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it enables the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

- 44 -

## D.      **The Private Communications Collected Are Valuable.**

123.    The Private Communications that the Third Parties (and other third parties) track and collect by way of the cookies on the Website are valuable to Defendant as well as the Third Parties (and other third parties).  Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its products to consumers, Defendant could use the data collected by the Third Parties to monitor users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendant and its products and services.

124.    Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the consumer electronics market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

125.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[1] Indeed, "[t]he monetary value of personal data is large and still growing, and  corporate America is moving quickly to profit from the trend."  *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

---

[1] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

126.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell his data or the consumer's willingness to pay to protect his information.

127.    Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**E.    Plaintiff's Experiences**

128.    Several times within the last year, Plaintiff visited the Website to browse products advertised on the Website with the intention of making a purchase.  Plaintiff was unaware of the secret spyware being used to surveil visitors and to monetize their personal information.

129.    At the time of Plaintiff's visits to the Website, the Website failed to present any type of a pop-up cookie consent banner notifying Plaintiff about either Defendant's Privacy Policy applicable to its Website or requesting Plaintiff's  assent to the Website's use of any cookies to collect Plaintiff's information about Plaintiff's device or about Plaintiff's interactions with the Website.

130.    In other words, the Website failed to provide a "Notice at Collection" of personal information in compliance with the CCPA, (Cal. Civ. Code § 1798.100(a)(1)-(3)), and California's regulation at 11 C.C.R. § 7012 at that time, which are part of the California Consumer Privacy Act Regulations.  11 C.C.R. § 7000(a).  Such Regulations define "Notice at Collection" to mean "the notice given by a business to a consumer at or before the point at which a business collects personal information from the consumer as required by Civil Code section 1798.100, subdivisions (a) and (b), and specified in these regulations."  11 C.C.R. § 7001(q).

131. Section 7012 provides, "The Notice at Collection shall be made readily available where consumers will encounter it at or before the point of collection of any personal information." 11 C.C.R. § 7012(c). Such regulation provides an "[i]llustrative example" as follows: "When a business collects consumers' personal information online, it may post a conspicuous link to the notice on the introductory page of the business's website and on all webpages where personal information is collected." 11 C.C.R. § 7012(c)(1). Section 7012 provides, "If a business does not give the Notice at Collection to the consumer at or before the point of collection of their personal information, the business shall not collect personal information from the consumer." 11 C.C.R. § 7012(d).

132. When Plaintiff visited the Website, he noticed the "Your Privacy Choices" link and toggled the "Targeting Cookies" option to the "off" position. Plaintiff viewed Defendant's representation on "Privacy Choices" link as a denial of non-essential cookies.

133. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff confirmed the choice of toggling off "Tracking Cookies." Plaintiff believed that selecting the "off" button on the pop-up banner found on the Website found at the "Your Privacy Choices" link would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of user data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

134. In selecting the "off" button Plaintiff gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. In reliance on these representations and promises, only when did Plaintiff continue browsing the Website.

135. Defendant nonetheless caused cookies and tracking technologies, including those used for performance targeting and social media functions, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without

- 47 -

Plaintiff's knowledge. Accordingly, the "Targeting Cookies" "off" switch that Plaintiff used to reject the use and/or placement of all non-essential cookies and tracking technologies while he browsed the Website was a lie. Contrary to what Defendant made Plaintiff believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen and did not stop it when Plaintiff opted out.

136. Then, as Plaintiff continued to browse the Website in reliance on the promises Defendant made in the "Your Privacy Choices" pop up, and despite Plaintiff's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing performance, targeting, and social media services, from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

137. Defendant's representations that consumers could opt out of cookies while Plaintiff and users browsed the Website were untrue. Had Plaintiff known this fact, he would not have used the Websites. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject "Targeting Cookies," Plaintiff would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

138. Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website was programmed to honor users' requests to reject cookies and tracking technologies, Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how

the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-essential cookies and tracking technologies, Plaintiff will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

139.   Thus, legal damages are inadequate to remedy the imminent threat of future harm that Plaintiff faces.  Only an injunction can remedy this threat of future harm.

## V.     CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Federal Wiretap Act

### (Violation of 18 U.S.C. § 2511)

140.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

141.   The federal Wiretap Act creates criminal liability for "any person who … intentionally intercepts … any wire, oral, or electronic communication," or who "intentionally uses" such content "knowing or having reason to know that the information was obtained through" interception.  18 U.S.C. § 2511(1)(a) & (d).

142.   The third-party cookies or tracking pixels installed on the Website were used to intercept the contents of communications between Plaintiff and the Website in real time, including HTTP requests, URLs visited, and other metadata exchanged as part of Plaintiff's interactions with the Website. These communications constitute "electronic communications" under 18 U.S.C. § 2510(12).

- 49 -

143. Defendant and/or its agents intentionally intercepted, or procured the interception of, these electronic communications using the cookies or tracking pixel technology, without Plaintiff's knowledge or consent.

144. The interception occurred contemporaneously with the transmission of the electronic communication, satisfying the "in transit" requirement under the Wiretap Act.

145. No exception under 18 U.S.C. § 2511(2)(d) applies because Plaintiff did not consent to the interception, and Defendant exceeded any purported authorization by misrepresenting the nature of the data collection and the identity of the third-party recipients.

146. Defendant acted with a tortious and unlawful purpose when it enabled and permitted third-party data brokers to intercept Plaintiff's electronic communications through the use of tracking pixels embedded on Defendant's website. Under 18 U.S.C. § 2511(2)(d), even if one party to a communication consents, the Wiretap Act is violated if the interception is made for the purpose of committing any criminal or tortious act. Courts have recognized that surreptitious data collection in violation of privacy rights can satisfy this "tortious purpose" standard. In *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021), the Ninth Circuit held that Facebook's interception of browsing activity via tracking technologies could constitute a violation of the Wiretap Act where the conduct was undertaken for the purpose of violating users' privacy rights, such as by committing the tort of intrusion upon seclusion. Here, Defendants' facilitation of a third-party's interception—despite promising to protect user privacy—was done with the purpose of enabling commercial exploitation of user data in violation of California common law privacy rights, including intrusion upon seclusion. This renders the interception unlawful under § 2511(2)(d).

147. Defendant intended to disclose its Website visitors' personally identifiable communications to Third Parties (and other third parties) so that it could deliver targeted advertisements to its customers despite its promise not to collect or use Private

- 50 -

Communications for users who selected the "off" switch next to "Targeting Cookies" in the "Your Privacy Choices" box.

148. Defendant customized and deployed the third-party code embedded on its Website, which allowed the transmission and storage of third-party cookies onto Plaintiff's device and browser, and, as a result, played an active role in the use of the code to intercept Plaintiff's electronic communications and knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts.

149. As a result of this unlawful interception, Plaintiff is entitled to damages under 18 U.S.C. § 2520(c)(2)(A)-(B), including the greater of actual damages and any profits made by the violator as a result of the violation or statutory damages of the greater of $100 per day per violation or $10,000, punitive damages under 18 U.S.C. § 2520(b)(2), reasonable attorney's fees under 18 U.S.C. § 2520(b)(3), and equitable relief and declaratory relief under 18 U.S.C. § 2520(b)(1).

## SECOND CLAIM FOR RELIEF

### Invasion of Privacy

150. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

151. To plead an invasion of privacy claim, Plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

152. Defendant has intruded upon the following legally protected privacy interests of Plaintiff: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, Article I, § 1, which guarantees Californians the right to privacy; (iii) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (iv) Plaintiff's Fourth Amendment right to privacy.

- 51 -

153.   Plaintiff had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could reject "Targeting Cookies" and tracking technologies before proceeding to browse the Websites. Plaintiff directed his electronic device to access the Website and, when he noticed it, opted to turn "off" the "Targeting Cookies" toggle under the "Your Privacy Choices" link. Plaintiff reasonably expected that his rejection of all non-essential cookies and tracking technologies would be honored. That is, Plaintiff reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on his devices while Plaintiff browsed the Website. Plaintiff also reasonably expected that, if Plaintiff rejected all cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiff's Private Communications, including his browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

154.   Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website application, or advertisement." Cal. Civ. Code § 1798.140(u)(1)(F).

155.   Plaintiff also had a reasonable expectation of privacy under the circumstances in regards to his October 2024 visit to the Website, as Defendant omitted material facts that it was duty-bound by California law to provide via a mandatory "Notice at Collection."

156.   "A duty to disclose a material fact can arise if … it is imposed by statute…." *Zeichner v. Nord Security Inc.*, 2024 WL 4951261, at *6 (N.D. Cal. Dec. 2, 2024) (quoting *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40 (2024)).  Here, the CCPA and its regulations imposed upon Defendant a statutory duty to disclose material facts about its collection of personal information from California consumers who used the Website

- 52 -

to avoid misleading such consumers about the nature of its personal information collection practices on the Website in October 2024.

157. Defendant violated the foregoing requirements by failing to provide a Notice at Collection in accordance with the CCPA. Such violations of the CCPA constitute material omissions by Defendant arising from a statutorily prescribed duty.

158. Defendant, in violation of Plaintiff's reasonable expectation of privacy, and without Plaintiff's consent, permits the Third Parties and other third parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendant allowed third parties to collect enables the Third Parties to, inter alia, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties (and other third parties) share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

159. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

160. Defendant's intrusion into Plaintiff's privacy was also highly offensive to a reasonable person.

161. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

162. Plaintiff has been damaged by Defendant's invasion of his privacy and is entitled to just compensation, including monetary damages.

163. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate him for the harm to his privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

164. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of all cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## THIRD CLAIM FOR RELIEF

### Intrusion Upon Seclusion

165. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

166. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

167. By permitting third-party cookies to be stored on consumers' devices, which enabled the Third Parties (and other third parties) to track and collect Plaintiff's Private Communications, including his browsing history, visit history, website interactions, user

input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the Website's pop-up cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

168. The Third Parties' (and other third parties') tracking and collecting of Plaintiff's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties (and other third parties)—was not authorized by Plaintiff, and, in fact, Plaintiff specifically chose to reject "Targeting Cookies."

169. Plaintiff had an objectively reasonable expectation of privacy surrounding his Private Communications on the Website based on Defendant's promise that users could reject non-essential cookies, as well as state criminal and civil laws designed to protect individual privacy.

170. Defendant's intentional intrusion into Plaintiff's and other Website users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could toggle off "Targeting Cookies" when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiff reasonably expected, based on Defendant's false representations, that when he rejected all cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on his device or permit the Third Parties to obtain his Private Communications on the Website, including his browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

- 55 -

CLASS ACTION COMPLAINT

171. Defendant's conduct was intentional and intruded on Plaintiff's Private Communications on the Website.

172. Plaintiff has been damaged by Defendant's invasion of his privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding $425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

173. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate him for the harm to his privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

174. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## FOURTH CLAIM FOR RELIEF

### California Invasion of Privacy Act

### (Violation of Cal. Penal Code § 631(a))

175. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

176. California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so

- 56 -

obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

177. The California Supreme Court has repeatedly stated an "express objective" of the California Invasion of Privacy Act ("CIPA"), codified at Cal. Penal Code § 630 *et seq.*, is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985).

178. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

"While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device*.

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements."

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted).

179. Section 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Court*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiff need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

"[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone

- 57 -

wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained"

Cal. Penal Code § 631(a).

180.    Section 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

181.    Defendant is a "person" within the meaning of California Penal Code § 631.

182.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

183.    The Third Parties' (and other third parties') cookies—as well as the software code of the Third Parties (and other third parties) responsible for placing the cookies and transmitting data from user devices to the Third Parties (and other third parties)—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

- 58 -

CLASS ACTION COMPLAINT

184. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes.

185. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

186. At all relevant times, the Website caused Plaintiff's browser to store the Third Parties' (and other third parties') cookies and to transmit those cookies alongside Private Communications—including his browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties (and other third parties) without Plaintiff's consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise enabled the Third Parties (and other third parties) to wiretap Plaintiff using the Third Parties' (and other third parties') cookies and to accomplish the wrongful conduct alleged herein.

187. At all relevant times, by their cookies and corresponding software code, the Third Parties (and other third parties) willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

188. The Private Communications of Plaintiff, on the one hand, and Defendant, on the other, that the Third Parties (and other third parties) automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data,

- 59 -

demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

189. At all relevant times, the Third Parties (and other third parties) used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

190. Plaintiff did not provide his prior consent to the Third Parties' (and other third parties') intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's electronic communications. Nor did Plaintiff provide his prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' (or other third parties') conduct. On the contrary, Plaintiff expressly declined to allow Third Parties' (or other third parties') cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiff's electronic communications by choosing to opt out of "Targeting Cookies" on the Website's "Your Privacy Choices" link.

191. The wiretapping of Plaintiff occurred in California, where Plaintiff accessed the Website and where the Third Parties (and other third parties)—as enabled by Defendant—routed Plaintiff's electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties (and other third parties), resided on Plaintiff's California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' (and other third parties') servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties (and other third parties).

192. Plaintiff has suffered loss by reason of these violations, including, but not limited to, (i) violation of his and their right to privacy; (ii) loss of value in [his] and their

Private Communications; (iii) damage to and loss of Plaintiff's property right to control the dissemination and use of their Private Communications; and (iv) loss of their Private Communications to the Third Parties (and other third parties) with no consent.

193. Pursuant to California Penal Code § 637.2, Plaintiff has been injured by the violations of California Penal Code § 631, and seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

194. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiff's electronic Private Communications with Defendant. Plaintiff, and the general public continue to be at risk because Plaintiff, and the general public frequently use the internet to search for and shop for products such as Plaintiff's. Plaintiff and the general public will continue to desire to use the internet for that purpose. Plaintiff and the general public have no practical way to know if their requests to reject all non-essential cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiff's electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

## FIFTH CLAIM FOR RELIEF

### California Invasion of Privacy Act

### (Violation of Cal. Penal Code § 638.51)

195. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

196. CIPA includes the following statement of purpose:

"The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of

- 61 -

eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

(Cal. Penal Code § 630.)

197. CIPA extends civil liability for various means of surveillance using technology, including the installation of a trap and trace device. Sections 638.50 and 638.51 of the California Penal Code are part of the CIPA.

198. California Penal Code § 638.51(a) provides that "a person may not install or use…a trap and trace device without first obtaining a court order.…"

199. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

200. The Third Parties' (or other third parties') cookies and the corresponding software code installed by Defendant on its Website is each a "trap and trace device" because each "captures" "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's computer or device. (Cal. Penal Code § 638.50(c).)

201. At all relevant times, Defendant caused the Third Parties' (and other third parties') cookies and the corresponding software code—which are trap and trace devices—to be placed on browsers and devices, and/or to be used to transmit Plaintiff's IP address and user-agent information. *See Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050-51 (S.D. Cal. 2023); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928-33 (N.D. Cal. 2024).

202. Some of the information collected by the Third Parties' (and other third parties') cookies and the corresponding software, including IP addresses and user-agent

- 62 -

information, does not constitute the content of Plaintiff's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

203. Plaintiff did not provide his prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiff informed Defendant that he did not consent to the Website's use of third-party cookies by toggling off "Targeting Cookies" in the "Your Privacy Choices" pop-up window.

204. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiff's IP address and user-agent information.

205. As a direct and proximate result of Defendant's conduct, Plaintiff suffered losses and was damaged in an amount to be determined at trial.

206. Pursuant to Penal Code § 637.2(a)(1), Plaintiff is also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

## SIXTH CLAIM FOR RELIEF

### Common Law Fraud

207. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

208. Defendant fraudulent and deceptively informed Plaintiff that he could opt out of "Targeting Cookies."

209. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked the "off" position next to "Target Cookies" in the "Your Privacy Choices" link. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's Private Communications, even when consumers had previously chosen to deny non-essential cookies.

- 63 -

210. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiff, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating their performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiff's—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to deny non-essential cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to use the Website. In misleading Plaintiff and not so informing her, Defendant breached its duty to Plaintiff. Defendant also gained financially from, and as a result of, its breach.

211. Plaintiff relied to his detriment on Defendant's misrepresentations and fraudulent omissions.

212. Plaintiff has suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of his Private Communications, including his browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiff has also suffered harm in the form of diminution of the value of his private and personally identifiable information and communications.

213. Defendant's actions caused damage to and loss of Plaintiff's property right to control the dissemination and use of their personal information and communications.

- 64 -

214. Defendant's representation that consumers could reject all cookies if they clicked the "Your Privacy Choice" link and rejected "Targeting Cookies" was untrue. Again, had Plaintiff known these facts, he would not have used the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that share personal information with third parties, such as performance, targeting, and social media cookies, even after they choose to deny "Targeting Cookies," Plaintiff would have noticed it and would not have interacted with the Website.

215. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiff to alter his position to his detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject all non-essential cookies. As a result, Plaintiff provided more personal data than he would have otherwise.

216. Plaintiff justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, was damaged by Defendant's conduct.

217. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiff has suffered damages, as alleged above, and is entitled to just compensation, including monetary damages.

218. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiff made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment

219. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

220. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

- 65 -

CLASS ACTION COMPLAINT

221. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could deny "Targeting Cookies" and by permitting the Third Parties to store and transmit cookies on Plaintiff's device and browser, which permitted the Third Parties to track and collect Plaintiff's Private Communications, including his browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Plaintiff rejected such cookies.

222. Plaintiff's Private Communications have conferred an economic benefit on Defendant.

223. Defendant has been unjustly enriched at the expense of Plaintiff, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

224. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiff conferred onto Defendant at his detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiff.

225. It would be unjust for Defendant to retain the value of Plaintiff's property and any profits earned thereon.

226. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

227. Plaintiff is entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiff to the position he occupied prior to having his Private Communications tracked and collected by the Third Parties.

228. Plaintiff pleads this claim separately, as well as in the alternative, to his other claims, as without such claims Plaintiff would have no adequate legal remedy.

## CLASS ALLEGATIONS

229. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

- 66 -

CLASS ACTION COMPLAINT

**All natural persons physically located in California who visited Defendant's website, selected a non-consent option in Defendant's "Your Privacy Choices" link, and thereafter had tracking cookies placed on their devices by Defendant.**

230. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be at least 10,000. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

231. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

      a. Whether Defendant shared Class Members' personal information with data brokers or other third parties;

      b. Whether Defendant obtained effective and informed consent to do so;

      c. Whether Plaintiff and Class Members are entitled to statutory penalties; and

      d. Whether Class Members are entitled to injunctive relief.

232. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

233. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

234. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is

impracticable and inefficient.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

235.  <u>AMOUNT IN CONTROVERSY</u>:  Inclusive of all class member claims, Plaintiff estimates that the amount in controversy is approximately $500,000,000.  The precise amount in controversy can be determined from Defendant's records.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a.  An order certifying the class and making all appropriate class management orders;

b.  An award of compensatory damages, including statutory damages where available, to Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing including both pre- and post-judgment interest thereon;

c.  An award of punitive damages;

d.  An award of nominal damages;

e.  An order for full restitution;

f.  An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

g.  An order permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

h.  An order for declaratory relief;

i.  For reasonable attorneys' fees and costs as allowed by law; and

j.  For such further relief as may be just and proper.

Dated:  March 19, 2026                PACIFIC TRIAL ATTORNEYS, APC


By: _/s/ Scott J. Ferrell_
Scott J. Ferrell
Attorneys for Plaintiff

- 68 -